UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

GAIL P. WINBUSH-JONES,

                       Plaintiff               DECISION AND ORDER

-vs-

                                      06-CV-6502 CJS

JOHN E. POTTER, Postmaster,
United States Postal Service,

                       Defendant
_____

APPEARANCES

For Plaintiff:               Donna Marianetti, Esq.
                            51 Neuchatel Lane
                            Fairport, New York 14450

For Defendant:             John J. Field, Esq.
                            Assistant United States Attorney
                            620 Federal Building
                            100 State Street
                            Rochester, New York 14614

INTRODUCTION

In this action Plaintiff alleges that her employer, the United States Postal Service ("USPS"), discriminated against her because of her disability, in violation of the Americans with Disabilities Act ("ADA") and New York Executive Law § 296. Now before the Court is Defendant's Motion for Summary Judgement (Docket No. [#11][1]). For the reasons that follow, the application is granted.

_____

[1]References in brackets ([# ]) are to the docket number of the document.

1

BACKGROUND

Unless otherwise noted, the following are the undisputed facts of this case.  Plaintiff Gail Winbush-Jones ("Plaintiff") has been employed by the USPS from 1981 until the Present.  Prior to March 1996, Plaintiff worked as a Supervisor of Distribution Operations ("SDO") in Rochester, New York.  On March 22, 1996, Plaintiff suffered a neck injury known as "cervical dystonia," as a result of a car accident.  Subsequently, Plaintiff was out of work for approximately two years, due to pain . (Plaintiff's Deposition ("Pl. Dep.") [#11-8] at 22).  When Plaintiff returned to work, she had the following physical restrictions: lifting not more than five pounds, standing for one hour in an eight-hour workday, walking for thirty minutes in an eight-hour workday, with additional restrictions on bending and reaching. (*Id.* at 44, 106; Defendant's Appendix, Exhibit B [#11-9] at 2).  Plaintiff was able to stand for fifteen to thirty minutes at one time. (Pl. Dep. at 91).  Plaintiff had no restriction on her ability to sit.

The USPS placed Plaintiff in a light-duty position, with the title "Attendance Control Supervisor." (Pl. Dep. at 25).  Plaintiff states that she "basically" held this same position until she stopped working in 2004, although the duties changed somewhat over time. (*Id.* at 27).  According to Plaintiff, the Attendance Control Supervisor's position was a light-duty accommodation. (*Id.* at 38).   As Attendance Control Supervisor, Plaintiff handled various matters, including tasks related to the Family Medical Leave Act ("FMLA").

Eventually,  Plaintiff learned that the Attendance Control Supervisor's position would be moved from Rochester to Buffalo.  As it turned out, the transfer of the position to Buffalo never occurred during the period relevant to this lawsuit. (Pl. Dep. at 42, 59).  Nevertheless, in anticipation of the position being transferred, Plaintiff and her supervisors took various steps to find a new position into which she could transfer, once the Rochester Attendance

2

Control Supervisor's position ended.  Although Plaintiff applied for the Attendance Control Supervisor's position in Buffalo, she told her supervisor, Ms. Benton ("Benton"), that she was interested in obtaining a position in Rochester dealing with FMLA matters. (*Id*. at 37-38).  Plaintiff subsequently applied for a position in Rochester entitled "FMLA Coordinator," however, she was not selected.  Apparently, the FMLA Coordinator's position, for which Plaintiff applied, covered the Rochester and Buffalo areas. (*Id*. at 49).  Another woman, Ms. Woelfel, was selected for the FMLA Coordinator's job. (*Id*. at 49).

Benton subsequently told Plaintiff that the only position that she had available for Plaintiff was as an SDO on the mail-room floor. (Pl. Dep. at 38-39).  Plaintiff responded that she could not go back to the type of work that she was doing prior to her accident. (*Id*. at 40).  Thereafter, Benton notified Plaintiff that there was an opening in a position entitled "In-Plant Support Supervisor." (*Id*. at 41).  Benton explained that Plaintiff would have the option of using a Cushman, a type of small motorized vehicle, to perform the position of In-Plant Support Supervisor. (*Id*. at 71-73) ("She wanted me to use the Cushman . . . in the In-Plant Support position.  If I had to use it – you know, there might be times I might have to use it. If I wasn't able to use it, she said she'd ask somebody else to do it.").  Benton told Plaintiff to obtain an authorization from her doctor, indicating that she could perform the In-Plant Supervisor's Job, which she did. (*Id*. at 54).  Subsequently, though, Plaintiff was never placed in the In-Plant Supervisor's position.  (*Id*. at 55).  At around this same time, Plaintiff heard discussion that another FMLA position would be created in Rochester. (*Id*. at 58).  Although Plaintiff would have been interested in the position, such a position was never posted. (*Id*. at 58-59).  However, in May 2004, one of Plaintiff's co-workers, Ms. Devoe, was

made the FMLA Coordinator for Rochester. (*Id.* at 59-60, 63).

In March 2003, Plaintiff's supervisors informed her that they were considering her for a position as SDO for the flat-sorter machine. (Pl. Dep. at 64-65). Plaintiff was offered the position, and in that regard, the written offer stated that the job would be consistent with Plaintiff's restrictions:

> This notice is to update your modified assignment based on operational needs and current work restriction information. This will afford you an opportunity for continued employment with the US Postal Service with injury residuals related to an accepted work related condition of sprained neck with left torticollis.
>
> ***
>
> This position is in compliance with your work capacity as described by, Charles Jordan MD and your physician, Dr. GM Pansari, which are: No walking greater than 30 minutes, no standing greater than 1 hr, no reaching above the shoulder with the L arm and no lifting over 5 lbs.
>
> The above duties require normal grasping and handling of objects up to 5 pounds, periods of seated work to include computer input, intermittent standing and walking on the workroom floor. You will be authorized the use of an in house motorized transport to limit required walking.

(Def. Appendix [#11-20], Exhibit M). Plaintiff, though, declined the offer, stating that it did not meet her physical restrictions. (Pl. Dep. at 67-68). Specifically, Plaintiff's objection to the position concerned the walking and standing requirements:

> This job offer is outside of my restrictions . . . because [it] requires more than 1 hour standing and 30 minutes walking in an 8 hour day.
>
> The duties described seem to be the regular duties demanded of a Distribution Operations Supervisor with no modifications. . . . The description of the job responsibilities cannot be performed with my restrictions, without putting my safety at risk for further injury. I have been/and still [am] . . . receiving Botox injections every 3 months for the past few years, and consistently take prescription pain medication and muscle relaxers with the job I have now, which is nowhere near as demanding.
>
> The motorized transport [Cushman vehicle] would aggravate my injury, but must be needed to perform these tasks 8 hours each day. However, I did

4

> inquire about it being modified to specifications for my use, (even though my medications cause drowsiness) and was told it could not be modified . . . Therefore, the motorized transport cannot be used to 'limit required walking' [as] stated in this job offer.  So the physical requirements of this job are outside of my restrictions. . . .  The 'intermittent/continuous standing and walking' is well over my limitations.  I cannot accept this job offer.

(Winbush-Jones letter, Docket No. 11-21 at p. 2).

   In April 2004, Plaintiff's supervisor, Linda Lombardo ("Lombardo"),  again offered her the position of SDO flat sorter.  In this regard, the job offer description was essentially the same as before, although it included the following statement: "You will be authorized the use of mobility assistive device designed to enable the mobility challenged." (Def. Appendix, Exhibit P).  According to Plaintiff, Lombardo told her that if she did not accept the position, she would not have a job once the Rochester Attendance Control Supervisor's position was eliminated. (Pl. Dep. at 69-71 ).  Plaintiff initially protested that she could not do the job, however, she accepted the position at Lombardo's urging. (Id. at 71).  In that regard, Lombardo explained that Plaintiff could use a smaller motorized scooter to minimize standing and walking, as opposed to the larger Cushman motorized vehicle that had previously been offered to Plaintiff as an accommodation.

   On May 19, 2004, while she was still working as the Attendance Control Supervisor, Plaintiff was sent for two-hours of training in the SDO flat-sorter's position. (Pl. Dep. at 82).  During the training, Plaintiff initially used the motorized scooter. (*Id*. at 85).  According to Plaintiff, though, she had to park the scooter for safety reasons. (*Id*.) ("I used the scooter to get to the operations, and I had to park the scooter because it would have been a safety hazard to put it in between the mail and the pallets of mail and the gurneys of mail, so I had to basically put the Cushman off to the side of the operations in order to train in the vicinity

of the machines."). Plaintiff experienced pain as a result of the training: "I ended up having pain in my neck and shoulder. . . . What was causing it was too much training involving me moving around too much. You can't sit – I couldn't sit on a scooter and do these things and check mail, check gurneys, check U-carts, check pallets. Because you have to go through these things, so you have to stand up to do these things." (*Id*. at 86).

On May 21, 2004, Plaintiff had her second training session for the SDO flat-sorter position. (*Id*. at 93). Plaintiff states that the second training session was harder than the first, because there was more mail and fewer employees. (*Id*. at 93-94). Plaintiff again was unable to use the scooter effectively: "[T]here *was* a lot more mail, a lot more volume. So the place I had to put the scooter was a little further back. I couldn't place the scooter anywhere near the machine, and it was worse this time because there was a lot of pallets and a lot of mail just lying all around the machines, the building, so there was no way I could maneuver the scooter . . . ." (*Id*. at 95). Plaintiff experienced back pain and headache, and as a result, she "just couldn't function." (*Id*. at 96). Plaintiff felt that she was not "competent as the other supervisors," and that there was "no way [she could] do it," which caused her to feel anxious and depressed. (*Id*. at 97). Plaintiff left the sorting floor, went to the nurse's office, and then went home on sick leave.[2] Plaintiff subsequently began receiving worker's

---

[2]According to Plaintiff, a "couple [of] days later," she talked by telephone with a supervisor named Mr. Lamendola ("Lamendola"). Plaintiff states that Lamendola told her "not to come back" to work, though she is unclear as to what was meant: "Q. Okay. And what was the conversation between you [and] Mr. Lamendola? A. I told him about my situation, about my dystonia and all that. That was basically – I don't remember any more details about that. Q. And when he said "Don't come back," what did you take him to mean? You shouldn't come back; you're not allowed to come back? Did you take any meaning from that? A. I took it several ways. One was, I shouldn't come back. I was using my sick leave. And the other way was, there might not be anything for me if I came back. I don't recall whether that was verbalized or not. (Pl. Dep. at 100-101). This vague explanation is not sufficient to raise a triable issue of fact as to whether Plaintiff was prohibited from returning to work. Nor does Plaintiff claim, as one of her claims in this action, that she was prevented from returning to work.

compensation benefits, and is still employed by the USPS, although she has not worked since May 21, 2004.  (*Id.* at 102-103). Since Plaintiff left work, the USPS has sent requests to her doctor, asking for updated information concerning her restrictions. (*Id.* at 103-104).

On May 27, 2004, approximately one week after leaving work, Plaintiff completed a USPS form complaint, alleging discrimination.  In a written statement attached to the complaint, Plaintiff stated, in relevant part:

> [Lombardo] stated there was no other job in the facility, this is my only choice. She also said the office is closing and the position is being abolished, putting an end to my current modified job offer which is Attendance Control Supervisor.  She assured me that this new job offer would be within my limitations because I would be given a scooter to supervise from. I expressed my concerns that I didn't want to be forced in a situation I could not handle, and didn't want to go backwards in my rehabilitation, after all I have supervised before and know what the physical demands are.  Ms. Lombardo did not seem concerned that I felt my health would be jeopardized.  I stated that this does not appear to be a modified job offer, I'd be expected to perform all duties as any other regular floor supervisor, including safety compliance for 'self and others' and I can't even ensure my own safety. These responsibilities would affect my evaluations and are based on my performance, advancements, or performance recognition awards and I would also be subjected to disciplinary action if my performance was not equivalent to what is expected of regular supervisors, which I view as unfair and discriminatory, resulting in an extremely stressful situation for me.  But Ms. Lombardo misled me to think this job was definitely within my limitations to promote her own self interest.  I felt pressured to sign the job offer to stay employed.

(Docket No. 11-26 at p. 8).

On June 17, 2004, USPS wrote to Plaintiff's doctor asking for clarification regarding Plaintiff's need for any additional reasonable accommodation.  Neither Plaintiff nor her doctor responded to the request.

On October 24, 2004, Plaintiff completed a sworn "EEO Investigative Affidavit," in which she described her inability to perform the SDO flat sorter position.  Notably, most of

7

Plaintiff's complaints about the job had nothing to do with her ability to lift, stand or walk.

In that regard, Plaintiff stated, in relevant part:

> This situation turned out wors[e] that I thought, Supervisor's responsibility is much more demanding and challenging. The mail volume and staffing was unpredictable (at best), there are always a host of problems; not enough employees, wrong mail on machines, too much mail, late mail, late dispatching of mail, machine breakdowns, safety concerns, training new employees, daily safety walks and talks, handling disputes with employees, complying with safety policies, checking all mail in area for correct sorting requiring constant and continuous bending, twisting, turning and standing which I cannot handle and [which] were beyond my restrictions. There might be 1 hour of intermittent seated work on a good day. This job also requires constant oral communicat[ion] with employees- which requires face-to-face communication in a noisy environment. Competing for pay increases, bonuses, facing disciplinary actions if mail processing requirements not met, meeting performance goals daily, reducing accidents and injuries – safety was a priority, locating employees for overtime, addressing leave request[s], issuing disciplinary actions to employees, controlling sick leave, competing with supervisors with no limitations is an unfair advantage. This job was not modified at all. Linda Lombardo, Acting In Plant Manager, told me I had no choice, and deceived me into believing that this job was modified, she stated, "how could I say I couldn't do it without trying it" and pressured me into signing it although I expressed concerns about my health.

(Docket No. 11-9 at p. 8).

On October 10, 2006, Plaintiff commenced the instant action. The Complaint [#1] alleges that Defendant discriminated against Plaintiff, "due to her disability by failing to reasonably accommodate [her]." (Complaint ¶ ¶ 24 & 26). In that regard, Plaintiff seeks relief under the Americans with Disabilities Act ("ADA") and the New York Human Rights Law.

On March 18, 2008, Plaintiff filed the subject motion for summary judgment [#11]. Defendant contends that the Complaint fails to state a claim under either the ADA or the New York Executive Law, since "[t]he sole remedy for a federal employee alleging disability discrimination is Section 501 of the Rehabilitation Act." (Defendant's Memo of Law [#11-32]

8

at 3) (*citing Rivera v. Heyman*, 157 F.3d 101, 103, 105 (2d Cir. 1998)).  Alternatively, Defendant argues that even if the Court treats Plaintiff's claim as being brought under the Rehabilitation Act, she cannot demonstrate a prima facie case.  In that regard, Defendant maintains that Plaintiff cannot show either that she could perform the essential functions of her job with or without reasonable accommodation, or that Defendant failed to offer hear a reasonable accommodation.  In support of the first argument, Defendant contends that, due to Plaintiff's previously-unknown neuropsychiatric condition, she is unable to supervise employees, which is an essential function of a supervisor's position.  As for the latter argument, Defendant contends that USPS offered Plaintiff a reasonable accommodation based upon her known restrictions, and that Plaintiff did not fulfill her obligation to participate in the interactive process required under the Rehabilitation Act.

In support of the summary judgment motion, Defendant submitted, *inter alia*, an affidavit [#11-19] from Lombardo, dated October 13, 2004.  Lombardo's affidavit states, in relevant part:

> Prior to me beginning my detail in Rochester, Gail had been given a job offer as a SDO in the Flat unit on tour 3 in [Rochester].  The position was identified as the SDO position that required the least amount of standing and walking.  Gail refused the original offer due to her concerns about the mobility device she was supposed to use to move about the building.  I met with Gail at the end of March [2004] (in the RMD room), reviewed the original job offer line-by-line, and discussed her concerns.  She told me she was not comfortable using the Cushman motorized device due to its size.  I offered to have the Postal Service lease a motorized scooter for her use to accommodate her standing and walking restrictions.  The scooter was small, easy to operate, and a similar one was being used . . . in the Buffalo [office].  I emailed Gail pictures of the scooter for her to review . . .  After Gail reviewed the pictures, we met again to discuss the modified job offer.  She felt the scooter would be okay for her to use.  We discussed the use of the scooter and it was decided that Gail would use the scooter for mobility instead of walking.  She would sit in the scooter instead of standing.  The modified job offer did not have any standing or walking requirements above Gail's restrictions.  There was an

9

ergonomically correct chair at the supervisor's desk in the area she was to supervise.   I consulted with . . . Safety Specialist, Colette Schadt, and Manager Injury Compensation, Mary McNeil, regarding the use of the motorized scooter to assist Ms. Winbush-Jones for mobility as a SDO, Flats. We personally checked out the work area prior to the formal job offer being made.  The aisles in the Flat sort unit were wide enough for the scooter to be used for mobility.  There was room for the scooter to be used to access most areas of the machine to supervise the unit and the employees.  There was minimal need for standing or walking.  Colette Schadt determined the scooter was safe for use [in the Rochester facility].   A similar one was being used by the Tour 2 MDO in [Buffalo] at the same time.

The day I met with Ms. Winbush-Jones to discuss the use of the motorized scooter . . . we reviewed the job offer line-by-line, and discussed her concerns.  Gail and I discussed many of the job requirements that she would have.   Gail had concerns about the responsibilities such as performance measurement and systems and standards, customer satisfaction indicators, communicating information and instructions, providing guidance, problem solving, writing reports, the care and security of equipment, and safety compliance.  After discussing these in detail, Gail was unable to identify a medical restriction that would prevent her from performing these duties.  Gail did not suggest any ways the SDO position could be modified to accommodate her medical limitations, other than her using the motorized scooter.  Gail was hesitant to accept the job offer at first because she had some concerns about her medication and the way it 'made her feel.'  Gail's use of medication was not documented with the Injury Compensation office and limitations due to the use of medication was not included in medical information provided by her personal physician.  Gail said that there may be times she could not deal with employees.  Gail never indicated she had a neuropsychiatric condition which prevented her from supervising employees. I asked Gail to try the job and told her we could adjust her job offer if she had any problems with any of the requirements. I asked her to contact me immediately if she had any problems with the job.  Gail never contacted me after she accepted the job offer.

***

The [SDO Flat sorter] duties mentioned required normal grasping and handling of objects up to 5 pounds, periods of seated work to include computer input, intermittent standing and walking.  Ms. Winbush-Jones was authorized the use of a motorized scooter designed to accommodate her standing and walking restrictions.

***

Due to the wide aisles, large area between machines, the small size of the scooter, and the ergonomic chair at the supervisor's desk, there was minimal need for Ms. Winbush-Jones to stand or walk (no more than an hour a day). The scooter could be used for mobility and supervision.

10

***

She was never asked to stand or walk.  During our meeting to discuss the job offer, I stressed to Gail that she needed to use the scooter for mobility and that is what the job offer she signed also stated.  There was no physical reason Ms. Winbush-Jones could not supervise using the scooter. Use of the scooter gave her access to every area she was responsible for without presenting a safety hazard.  There was no need for the standing and walking which Gail claims caused a recurrence of her injury.  The job offer was well within Gail's restrictions of 'No walking greater than 30 minutes, no standing greater than 1 hour, no reaching above the shoulder with the left arm and no lifting over 5 pounds.'  The only physical work required of the SDO position is standing and walking.

***

Ms. Winbush-Jones did not notify the Postal Service until 6/7/04 of her additional non-work related 'Neuropsychiatric Condition (ability to take supervision, meet deadlines).  No direct supervision, cannot do direct supervision' This was long after she accepted the job offer dated April 5, 2004.  Gail only trained on the SDO Flats job for two days.  She was only training and never was left alone to supervise.  She never had full responsibility in the position, was only in a training capacity, and was only observing the operation.

***

Gail trained with Laura [Cubas-Hoelscher] on 5/19/04, had annual leave on 5/20/04, and trained for part of the day on 5/21/04.  On 5/21/04, she left work early and has not returned since.  Gail never contacted me after she started training and we have not had any communication since.

***

Gail stood and walked above her restrictions during her one and one half days of training with Laura Cubas-Hoelscher on 5/19/04 and 5/21/04.  She intentionally did not use the scooter to accommodate her standing and walking restrictions.

(Lombardo Affidavit [#11-19] at  2-4).

On May 23, 2008, Plaintiff filed opposing papers.  Plaintiff admits that her claim was incorrectly brought under the ADA and New York Executive Law, and contends that her claim should be "construed as a claim under the Rehabilitation Act."  Alternatively, she requests permission to amend the complaint. Additionally, Plaintiff maintains that there are

11

triable issues of fact that preclude an award of summary judgment.[3]   With regard to Defendant's first argument, that Plaintiff cannot perform the essential functions of the job, Plaintiff argues, incorrectly, that Defendant's contention lacks merit because it concerns the essential functions of the supervisory job that Plaintiff held *prior to* her accident. (Pl. Memo of Law [#16] at 13).   Additionally, Plaintiff maintains that she was able to perform the essential functions of jobs such as the FMLA Coordinator's job or the In-Plant Support job. According to Plaintiff, the only real issue before the Court is whether Defendant offered her a reasonable accommodation.   On this point, Plaintiff contends that Defendant failed to do so, since it did not offer her the FMLA Coordinator's jobs or the In-Plant Support job. (*Id.* at 14).   Plaintiff further argues that the SDO flat sorter position was not a reasonable accommodation, since it did not match her physical restrictions.

In support of her position, Plaintiff submitted an affidavit, in which she devotes much of the discussion to her previous job, and the fact that she was interested in being reassigned to an FMLA Coordinator's position or an In-Plan Support position. ([#14] at ¶¶ 7- 21, 24-26, 41).   With regard to the SDO Flat sorter position, Plaintiff states that her doctor did not approve her to perform the position using a Cushman vehicle, because "there [was] no back or neck support and there is no mirrors in it.   There is no steering wheel.   There are handlebars, and it aggravates her neck pain when she pulls the handle. . ." (*Id.* at ¶ 28).[4]

---

[3]The Court notes with disapproval that, due to the apparent recycling of form briefs and poor editing, Plaintiff's Memo of Law contains arguments, concerning a "Ms. Essler" and "Mr. Whitmore," that have nothing to do with this case. (Pl. Memo of Law at pp. 11-12).   The memo also incorrectly states that Plaintiff established a prima facie case of "race discrimination." (*Id.* at 12).

[4]Plaintiff's statement regarding the Cushman vehicle is irrelevant, since, as discussed elsewhere in this Decision, Plaintiff was provided with a different, smaller, motorized scooter to accommodate her concerns about the Cushman.   It is also irrelevant because Plaintiff's complaints concerning the scooter, during training on May 19, 2004 and May 21, 2004, did not pertain to any physical inability to operate the scooter, but rather,

Plaintiff further states that, although Defendant later provided for her to use a smaller motorized scooter, "[i]n practicality the scooter was useless.  It could not be safely maneuvered through this work area.  Moreover, the type of work in this area required me to repeatedly get off the scooter to perform my duties which included bending, lifting and dealing with malfunctioning machinery." (*Id*. at ¶ 31).

Oral argument was scheduled to be heard on July 31, 2008.  However, at the request of Plaintiff's counsel, the Court adjourned oral argument, and rescheduled it for February 12, 2009.  On February 11, 2009, Plaintiff's counsel informed the Court that she was unable to appear the following day, and that she consented to the motion being submitted on the briefs.  Defendant's counsel also agreed to submit the motion on the briefs.  Accordingly, the Court did not re-schedule oral argument.  The Court has now thoroughly considered the parties' submissions and the entire record.

## DISCUSSION

### *Summary Judgment Standard*

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co*., 398 U.S. 144, 157 (1970).  "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL

_____

to the fact that there was not sufficient room to maneuver the scooter.

PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.).  "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996)(*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)), *cert denied*, 517 U.S. 1190 (1996).

The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e);  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249; *see also*, FED. R. CIV. P. 56(e)("When a motion for summary judgment is made and supported as provided in this rule, and adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.").  Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).  The parties may only carry their respective burdens by producing evidentiary proof in admissible form. FED. R. CIV. P. 56(e).  The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

At the outset, is its clear that Defendant is entitled to summary judgment, to the extent that Plaintiff's claims are brought under the ADA and the New York Executive Law.

In that regard, Defendant is correct that, as a federal employee, Plaintiff's only recourse for disability discrimination is under the Rehabilitation Act. *Rivera v. Heyman*, 157 F.3d 101, 103 (2d Cir. 1998) ("As a federal employee, Rivera has no remedy for employment discrimination under the ADA. . . .  His sole claim for discrimination on the basis of disability is under the Rehabilitation Act, if anywhere.").   Specifically, Plaintiff's right to sue arises under Section 501 of the Rehabilitation Act. *Id.* at 104-105.   Moreover, even if the Court were to allow Plaintiff to amend the complaint to assert a Rehabilitation Act claim, Defendant would still be entitled to judgment for the reasons discussed below.

*Rehabilitation Act*

The general legal principles applicable to a claim under Section 501 of the Rehabilitation Act are clear:

> Section 501 of the Rehabilitation Act of 1973, as amended, bars federal
> agencies from discrimination on the basis of an individual's disability, using
the standards set forth in the [ADA].  The ADA defines discrimination to include both adverse employment actions based on the employee's disability, and not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of the business.

*Carter v. Potter*, No. 06-CV-3854 (JG)(LB), 2008 WL 1848639 at *3 (E.D.N.Y. Apr. 23, 2008) (citations and internal quotation marks omitted).  In the instant case, the only claim that is arguably before the Court is that Defendant failed to provide Plaintiff with a reasonable accommodation in connection with the "SDO flat sorter" position.  To the extent that Plaintiff may now be attempting to claim that Defendant discriminated against her by failing to hire her for the FMLA or In-Plan Support positions, Defendant would be entitled to summary judgment, since the Complaint fails to state such a claim.  Specifically, the only reference to these other positions contained in the Complaint is the following: "[O]n or about

May 17, 2004, plaintiff was forced to accept a 'modified' rehabilitation job.  Plaintiff disputed that this position would accommodate her disabilitiy and requested that she be placed in other available position(s) which did, in fact, accommodate her disability." (Complaint ¶ 17). The Complaint does not purport to allege a claim for failure to hire.  Most notably in that regard, Plaintiff does not allege that she was denied the "other available position(s)" because of her disability.  Rather, the Complaint alleges only that Defendant discriminated "by failing to reasonably accommodate the plaintiff." (Complaint, ¶ ¶ 24 and 26).

With regard to the alleged failure to accommodate, to establish a prima facie case under the Rehabilitation Act, a Plaintiff  must demonstrate: "(1) that he is an individual who has a disability within the meaning of the statute, (2) that an employer covered by the statute had notice of his disability, (3) that with reasonable accommodation, he could perform the essential functions of the position sought, and (4) that the employer has refused to make such accommodations." *Stone v. City of Mount Vernon*, 118 F.3d 92, 96-97 (2d Cir. 1997) (citation omitted).

The Court finds, at the outset, that Plaintiff cannot demonstrate that Defendant denied her accommodation by failing to place her in the FMLA Coordinator or In-Plant Support positions.  On this point, although it is clear that Plaintiff preferred being placed in one of those positions, Defendant was not required to accede to Plaintiff's requests. Instead, Defendant was only required to make a reasonable accommodation. *See, Fink v. New York City Dept. Of Personnel*, 855 F.Supp. 68,72  (S.D.N.Y. 1994) ("There is no provision requiring the employer to take account of the disabled individual's preference in choosing the means of accommodation."), *aff'd, Fink v. New York City Dept. Of Personnel*, 53 F.3d 565, 567 (2d Cir. 1995) ("As the Act [Section 504] has been interpreted, it requires

16

the employer to make a reasonable accommodation of the plaintiff's disability. . . .  It does not require the employer to provide every accommodation the disabled employee may request, so long as the accommodation provided is reasonable.") (citation omitted).

The Court will now consider Plaintiff's claim that Defendant failed to provide a reasonable accommodation with regard to the SDP Flat Sorter position.  In that regard, in addition to the principles of law set forth above, it is clear that the employee and the employer are required to participate, in good faith, in the "interactive process" of arranging a reasonable accommodation, and that a plaintiff who causes the breakdown of the interactive process may not recover. *Nugent v. St. Lukes-Roosevelt Hosp. Ctr.*, 2008 WL 5341379 at *2 (2d Cir. Dec. 22, 2008) ("With regard to the disability discrimination claims, federal regulations contemplate an 'informal, interactive process' involving employer and employee to identify a reasonable accommodation. 29 C.F.R. § 1630.2(o)(3). An employee who is responsible for the breakdown of that interactive process may not recover for a failure to accommodate."); *see also*, *Parker v. Sony Pictures Entertainment, Inc.*, 260 F.3d 100, 114 (2d Cir. 2001) ("Were the breakdown in the interactive process manifestly [plaintiff's] fault, his claim might be deemed frivolous.").

Here, Plaintiff maintains that Defendant failed to offer her a reasonable accommodation.  To be clear, the accommodation that Defendant offered was to place Plaintiff in the SDO Flat Sorter position, which required a minimal amount of walking and standing as compared to other SDO positions,[5] and to provide her with a motorized scooter, to bring the walking and standing requirements of the position within her stated physical

---

[5]*See*, Lombardo Affidavit, Docket No. 11-19 at p. 2 ("The position was identified as the SDO position that required the least amount of standing and walking. ").

17

limitations. Plaintiff spent approximately three and one half hours training in the SDO Flat

sorter position,[6] before deciding that it exceeded her limitations, and leaving the job. In that

regard, Plaintiff contends that the scooter was not useful, because mail was stacked in the

aisles, and because the job appeared to require more standing than she anticipated.[7]

For purposes of this motion the Court will assume, *arguendo*, that during the few

hours that Plaintiff spent training for the position, mail was stacked in the aisle, as Plaintiff

claims. Nevertheless, the Court finds, as a matter of law, that Plaintiff caused the

breakdown in the interactive process that is required under Section 504. It is undisputed

that prior to leaving work on May 21, 2004, Plaintiff never contacted Lombardo, or otherwise

sought to have the duties of the job adjusted to address her concerns, even though

Lombardo had specifically directed Plaintiff to contact her if there were any problems, and

had told Plaintiff that further adjustments could be made if Plaintiff had any problem.[8]

(Lombardo Affidavit, Docket No. 11-19 at p. 3) ("I asked Gail to try the job and told her we

could adjust her job offer if she had any problems with any of the requirements. I asked her

to contact me immediately if she had any problems with the job."). Even assuming that

---

[6]Plaintiff spent a total of 3.5 hours training for the flat sorter job: 2 hours the first day (Pl. Dep. at 84), 1.5 hours the second day. (*See*, Winbush Statement, Docket No. 11-9 at p. 9) (Stating that on May 21, 2004, "after 1½ hour, I called the Lead Manager, Sam Lamendola and left a voice message that I was going to the medical unit.").

[7]Additionally, apart from the physical demands of the job, Plaintiff decided that the non-exertional supervisory duties of the job would be significantly more difficult than those of her previous, light-duty position. However, prior to accepting the SDO flat sorter position, Plaintiff did not ask Defendant to accommodate her with regard to the supervisory aspects of the position that she found too difficult. Moreover, even if she had, it is clear that "[r]easonable accommodation does not include modifications that would eliminate an essential job function. " *Lowry v. Eastman Kodak Co.*, 14 Fed. Appx. 27, 30, 2001 WL 682447 at *2 (2d Cir. Jun. 13, 2001) (Unpublished).

[8]Clearly, mail can be moved from aisles if it is blocking the supervisor's way. Moreover, if given the chance, Lombardo could have explained to Plaintiff how the job was to be performed from a sitting position.

Plaintiff was too emotionally distraught on May 21, 2004, to contact Lombardo, there is no indication that Plaintiff ever subsequently contacted her, or requested further accommodations with regard to the SDO flat sorter position.   Instead, she filed a discrimination complaint, and demanded a different job. (*See*, Age Discrimination Complaint, Docket No. 11-26 at p. 10) ("Because I feel I was recklessly put in a hazardous situation, I am requesting . . . a job within my limitations that will not put my safety and health in jeopardy and comparable to the Attendance Control modified job I previously held.").   Plaintiff suggests that it was impossible for her pursue further dialog with USPS, because, on May 21, 2004, she "suffered injury which resulted in her being removed from work thereby precluding any possible intervention of Ms. Lombardo." (Pl. Stmt. Of Facts, ¶ 26).   However, Plaintiff's alleged injury did not prevent her from filing a discrimination complaint six days after she left work.   Surely, if Plaintiff was well enough to file a discrimination complaint, she was well enough to communicate with Lombardo.

Even assuming, *arguendo*, that Plaintiff was somehow unable to discuss further accommodations after leaving work on May 21, 2004, she still cannot recover under the Rehabilitation Act.   In the first place, Plaintiff's alleged inability to return to work was largely due to psychiatric problems, of which USPS had no prior notice.   Moreover, to the extent that Plaintiff was unable to return to work because she had aggravated her neck condition, defendant is not at fault.   In that regard, Plaintiff admits that she chose to exceed her physical limitations during training on March 19, 2004 and March 21, 2004, which led to her injury.   Specifically, rather than contacting Lombardo and notifying her that she was unable to use the scooter as envisioned in the job offer, Plaintiff decided to stand and walk. (Pl. Dep. at pp. 85-87, 93-96) (*see also*, Pl. EEO Investigative Affidavit, Docket No. 11-9 at p.

8: "As I was being trained by Laura Hoelscher, Supervisor, I came to the realization that there was more walking and standing than my limitations allowed, but continued to follow her around, inspecting mail, going through machines, instructing employees in pain."; *Id.* at p. 9: "I could not do these things from a scooter, so I parked it and had to walk and stand causing more pain than usual in my upper back, neck, head and shoulder area, and developed a migraine headache."); (Pl. Affidavit at ¶ 34: "I was having to check the machines for jams, open the machines, take the jams out- all of which happened frequently in this area.  This involved standing, bending, reaching and was far beyond my physical restrictions.").  Although Plaintiff blames Defendant for the aggravation of her injury, it is clear that Plaintiff acted unreasonably in exceeding her physical limitations, rather than contacting Lombardo and pursuing the interactive process as Lombardo had instructed her to do.

In short, Plaintiff left work after only three and a half hours of training, without fully utilizing the accommodation, and without notifying the Defendant that there was a problem with the proffered accommodation.  On this point, the Court also notes that there was no apparent urgency regarding the interactive process, which would have prevented further discussion between the parties.  That is, even though Plaintiff had begun training for the SDO flat sorter position, there is no indication that any deadline had been set for Plaintiff's job as Attendance Control to end, and for her job as SDO flat sorter to begin. (*See*, Pl. Dep. at 59, indicating that the Attendance Control Office never closed: "*Q.* What ever happened to the Attendance Control operation in Rochester?  Did it finally shut down and move to

Buffalo? *A.* Not before I left, no.").[9]   Nor did the USPS give any indication that it was opposed to further discussion.  Although Plaintiff attempts to show otherwise, and contends that Lombardo essentially forced her to take the SDO flat sorter job, or face unemployment, that argument misses the point, since, as discussed above, USPS was not required to give Plaintiff any particular job, as long as it provided a reasonable accommodation.  Lombardo's uncontradicted affidavit indicates that the USPS was willing to make additional accommodations to Plaintiff, in the event that she had difficulties performing the SDO flat sorter job.  However, Plaintiff left work before Defendant had an opportunity to offer further accommodations.   Particularly where, as here, Plaintiff initially agreed to the proffered accommodation, albeit apprehensively, she had an obligation to notify USPS of any problems, and allow it an opportunity to correct them.

Based upon all of the foregoing, the Court finds, as a matter of law, that Plaintiff unreasonably caused the breakdown of the interactive process.  Accordingly, she cannot recover under the Rehabilitation Act. *See, Loulseged v. Akzo Nobel, Inc.*, 178 F.3d 731, 740 (5th Cir. 1999) (Holding that district court properly granted judgment as a matter of law to defendant-employer, where plaintiff quit rather than giving employer an opportunity to continue with the interactive process); *see also, Rennie v. United Parcel Service*, 139 F.Supp.2d 159, 172-173 (D.Mass. 2001) ("The act of quitting was, in essence, a complete failure to continue to engage in the interactive process and prevented [defendant] from making any further attempts to reasonably accommodate [plaintiff].") (*citing Loulseged*).

---

[9]*See also, Id.* at 81-82: "*Q.*  Now, did there come a point in time when you actually stopped working as the Attendance Control Supervisor and started training to work as the DTO flat sorter job? [sic] *A.* Yes. *Q.* When did that happen?  *A.* I never stopped working in the Attendance Control office because it wasn't closed. *Q.* Okay.  *A.* But two hours, I was told to go to the flat sorter area to train for a couple hours."

CONCLUSION

Defendant's application [#11] for summary judgment is  granted, and this action is

dismissed.

SO ORDERED.

Dated:        Rochester, New York
              February 24, 2009

                              ENTER:


                              /s/ *Charles J. Siragusa*
                              CHARLES J. SIRAGUSA
                              United States District Judge